# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| DIANE KINZEBACH,<br><br>    Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | No. 16-CV-2114-LRR<br><br>**REPORT AND RECOMMENDATION** |

    Plaintiff Diane Kinzebach's application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, is before the court for a second time: the court previously reversed a decision of the Commissioner of Social Security (the Commissioner) denying Kinzebach benefits for failing to provide a "good reason" for discounting the residual functional capacity (RFC) opinion of Kinzebach's treating physician, Dr. James Peterson. On remand from this court, the administrative law judge (ALJ) found that Dr. Peterson's RFC opinion was inconsistent with the record as a whole and again denied Kinzebach benefits. Kinzebach appeals, arguing that the ALJ erred in weighing the medical-opinion evidence, including Dr. Peterson's opinion, and her subjective complaints. I recommend that the Commissioner's decision be **affirmed**.

## I.    BACKGROUND[1]

    Kinzebach filed applications for DI benefits in August 2007 and February 2009, alleging disability beginning on August 21, 2007, due to her past colon cancer and resulting bowel problems, problems with her legs (pain and neuropathy), and (for the

---

[1] For a more thorough overview, see the Statement of Facts (Doc. 13), the appendix to the Statement of Facts (Doc. 13-1), and the court's previous opinion in this case (AR 1325-44).

first time in the 2009 application) back pain. AR 306, 348. The ALJ found (and neither party challenges) that Kinzebach was eligible for DI benefits for a disability established on or before September 30, 2012, making the relevant time period August 21, 2007, to September 30, 2012. AR 1217.

Her applications were denied initially and on reconsideration. AR 76-78. In connection with those reviews, state agency consultants evaluated her physical RFC[2]: Dr. Judy Panek in November 2007 and Dr. Chrystalla Daly in April 2009. AR 520-25, 623-29.[3] Before the ALJ hearing, Kinzebach submitted an additional physical RFC opinion from her primary care physician, Dr. Peterson, which he completed on June 28, 2010. AR 744-48.

Kinzebach's first video hearing before an ALJ occurred on August 26, 2010, and a few months later, the ALJ denied her request for DI benefits. AR 58, 82-94. The Appeals Council vacated and remanded that decision, finding that the ALJ needed to resolve the following issues:

- [Dr. Peterson] opined that the claimant could work for four hours a day at a light lifting level, and could sit/stand 30 minutes at a time with occasional postural limitations. The [ALJ] provided some weight to these limitations, but did not specifically discuss the limitation that the claimant could work for only four hours a day. Further evaluation of this opinion is necessary.
- The decision indicates that the claimant had the [RFC] to perform a range of light work, but could only "walk three blocks." The length of time the claimant can walk . . . is unclear. Further evaluation of the claimant's [RFC] is necessary.
- The hearing decision includes "bowel incontinence" as a severe impairment, but no associated limitations are provided in the [RFC] assessment.

---

[2] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

[3] Dr. James Wilson also affirmed Dr. Daly's findings in July 2009. AR 660.

AR 101 (citations omitted). The Appeals Council instructed the ALJ on remand to obtain and address additional evidence concerning Kinzebach's physical RFC, to give further consideration to Dr. Peterson's RFC opinion, and to provide further explanation of the ALJ's RFC limitations "with specific references to evidence of record in support." AR 102-03. A second hearing was held on March 14, 2013, and a second ALJ opinion issued the next month, again denying Kinzebach DI benefits. AR 18-34, 43. In addition to the RFC opinions discussed above, the ALJ considered a letter date January 5, 2012, from physician assistant Angela Schreiber (PA Schreiber) and an opinion dated September 24, 2012, by one-time consultative examiner and physician assistant Robert Welshons (PA Welshons), which was also signed by Dr. Adam Roise. AR 29-30, 842, 1142-44.

The Appeals Council denied Kinzebach's request for review, and she appealed the ALJ's decision to this court.[4] AR 1318, 1325-44. The court held that the ALJ did not give "good reasons" for rejecting Dr. Peterson's RFC opinion. AR 1343. The court reasoned:

> At various points in his decision, the ALJ points out instances where Kinzebach indicated that her pain was less or better, and she was able to function fairly well. However, the ALJ completely ignores evidence in the record where Kinzebach's signs and symptoms show greater pain and functional limitations. . . . [I]n his decision, the ALJ focuses on instances where Kinzebach's back pain appeared better in January and February 2012, . . . gloss[ing] over the fact that she underwent back surgery in May 2012.

AR 1341-42. The court further reasoned that the ALJ did not cite to specific evidence in the record inconsistent with Dr. Peterson's RFC opinion and that the ALJ did not address Dr. Peterson's opinion that Kinzebach could work only four hours a day, which the Appeals Council had instructed the ALJ to address on remand. *Id*. The court reversed the ALJ's decision and remanded for further proceedings, ordering that on remand "the

---

[4] The Honorable Jon Stuart Scoles, then-Chief United States Magistrate Judge for the Northern District of Iowa, by consent of the parties.

ALJ shall provide clear reasons for accepting or rejecting Dr. Peterson's opinion[]" with support from the record. AR 1344.

A third video hearing was held on November 24, 2015, this time before ALJ Eric S. Basse, who had not presided over the prior proceedings. AR 1245. On March 30, 2016, the ALJ issued the third (and final) opinion denying Kinzebach DI benefits. AR 1217-33. As with the previous opinions, the ALJ followed the familiar five-step process outlined in the regulations[5] to determine whether Kinzebach was disabled. As before, the ALJ found that Kinzebach suffered from the following severe impairments during the relevant time period: "history of rectal cancer, status post-surgery, chemotherapy and radiation; degenerative disc disease of the lumbar spine; [and] status-post back surgery May 2012." AR 20, 1219. In determining Kinzebach's RFC, the ALJ found that she could perform light work, which requires standing for six hours and sitting for two hours in an eight-hour day,[6] except:

> [S]he could lift 20 pounds occasionally and 10 pounds frequently. She could stand or sit throughout an 8-hour day with regular work breaks. She could walk 3 blocks at a time. She had to avoid ladders, ropes and scaffolds. She had to avoid work at heights. The claimant had to have ready [sic] available access to a bathroom.

AR 1221.[7] Based on this RFC, the ALJ found that Kinzebach could perform her past

---

[5] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* 20 C.F.R. § 404.1520(a)(4). The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[6] 20 C.F.R. § 404.1567(b); Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

[7] The second ALJ opinion had found essentially the same RFC as the third but did not include the limitation related to bathroom access. AR 22.

4

work as a receptionist and material clerk. AR 1232. Thus, the ALJ once again found that Kinzebach was not disabled. AR 1233.

The Appeals Council denied Kinzebach's request for review on September 30, 2016 (AR 1207-10), making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. Kinzebach filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Doc. 2). *See* 20 C.F.R. § 422.210(c). The parties briefed the issues (Docs. 14-16), and the Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## *II. DISCUSSION*

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Kinzebach challenges only the ALJ's RFC determination. She argues primarily that the ALJ did not give a "good reason" for discounting Dr. Peterson's opinion, including because the ALJ did not follow this court's remand order. She also argues that the ALJ erred in assigning little weight to PA Schreiber's RFC opinion and great weight to the state agency consultants' opinions, and in discounting her subjective complaints.

5

### A. Dr. Peterson's RFC Opinion

When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence." 20 C.F.R. § 404.1527(b) (2017).[8] The ALJ must give controlling weight to a treating-source opinion if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Id.* § 404.1527(c)(2). "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016). The ALJ considers the following factors to determine the weight to assign the opinion:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting 20 C.F.R. §§ 404.1527(d), 416.927(d) (2008)); *see also* 20 C.F.R. § 404.1527(c) (2017).

Dr. Peterson is Kinzebach's primary care physician. He managed her pain medications for much of the relevant time period, although he was not involved in her treatment from June 2010 through April 2012 (Kinzebach quit seeing Dr. Peterson because he wanted to taper her use of short-acting opioids). *See* Doc. 13-1; AR 63, 654. Dr. Peterson opined in June 2010 that Kinzebach could work for four hours in an eight-

---

[8] New regulations for evaluating medical opinions went into effect on March 27, 2017, and some, by their terms, apply retroactively. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). The Eighth Circuit has applied these new rules retroactively, which are substantively the same as the old rules. *See, e.g.*, *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017); *but see Young v. Berryhill*, 689 F. App'x 819, 821 n.3 (5th Cir. 2017) (per curiam) (applying old rules in effect "at the time of the ALJ's determination, rather than" the new rules). I cite to the new 2017 regulations.

6

hour day and that she could sit and stand for thirty minutes at a time. AR 747. He found her limited to occasional bending, crawling, stooping, balancing, climbing, and kneeling. *Id.* Like the ALJ, he found that Kinzebach could lift ten pounds frequently and twenty pounds occasionally. *Id.* He concluded that Kinzebach suffers from severe pain that interferes with her day-to-day functioning and ability to sleep. AR 748.

The ALJ assigned little weight to Dr. Peterson's opinion, finding it "inconsistent with other substantial evidence in the case record." AR 1223. Contrary to Kinzebach's argument otherwise, this is a "good reason" for discounting the opinion of a treating physician. *See Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004) (opinions from treating sources may be "given less weight if they are inconsistent with the record as a whole"). It also differs from the reasoning previously rejected by this court. *See* AR 1341 (district court addressed the reason given by the ALJ that Dr. Peterson's opinion was "inconsistent with evidence not available to Dr. Peterson at the time he provided his opinions on Kinzebach's functional limitations"). The ALJ also cited additional evidence as support that Dr. Peterson's opinion was inconsistent with the overall record. *Compare* AR 22-32, *with* AR 1223-32.[9]

Substantial evidence supports the ALJ's conclusion that Dr. Peterson's opinion was inconsistent with the overall record. In September 2007, Kinzebach reported having almost no difficulties with her activities of daily living: she reported making dinner for her husband daily (sometimes spending up to an hour cooking hamburgers, potatoes, and a vegetable without resting); cleaning her house for more than an hour each day (sometimes needing a break); doing laundry for a half hour every day; attending to her

---

[9] Additional cited evidence includes a September 2007 CT scan (AR 1223); letters from Kinzebach's former coworkers (AR 1227, 1230-31); treatment notes from March 2008 (AR 1224), January 2009 (AR 1224), February 2009 (AR 1224), and March 2010 (AR 1224); and additional notes from a September 2007 appointment with neurologist Dr. Sangatta Goel (AR 1223), an October 2007 Magnetic Resonance Imaging (MRI) (AR 1223-24), an April 2008 appointment with vascular surgeon Dr. R. Gerald Sarsfield (AR 1224), a June 2009 appointment with Dr. Jill Briggs (AR 1224), and April 2010 electrodiagnostic testing (AR 1224-25).

7

personal grooming needs; going grocery shopping once a week for an hour; handling money; driving; taking one-mile walks three to four times a week; watching movies; making crafts; and doing light gardening. AR 314-18, 332. During this time period, she reported "extreme pain" in her legs, but because her legs hurt regardless of what she did, she continued to perform her normal activities of daily living. AR 320. Her husband reported similar activities of daily living, adding that she went to church weekly and her son's softball games one to two times a week. AR 326. In March 2009, Kinzebach reported hip and leg pain but continued to assert that her bowel problems were the most limiting, because she always needed to be near a bathroom. AR 367-68. She reported the same activities of daily living as before, including cooking, cleaning, and running errands, but that she could walk only a half mile before needing to use the restroom or sit down. AR 369-70, 374-378, 380. She also reported going out to lunch once a month. AR 377. She reiterated that she is always in pain, no matter what she does, and it therefore makes no difference whether she sits for five minutes or an hour. AR 380. In December 2010, shortly after the first ALJ opinion denying her benefits, Kinzebach sent a letter to the Social Security Administration stating that she had not been to church in a long time; that she had not been to a softball game in two years and that even if she had, sitting on hard bleachers would have been worth it because she loves her son; that she no longer makes jewelry; and that she "won't be doing any more gardening." AR 424-25. In material filled out by Kinzebach in July 2012, she admitted that she took online courses in jewelry making after she quit working, but stated "[u]nfortunately[,] the jewelry business did not take off," and "[e]ven if it did, [she] c[ould] no longer sit for very long." AR 442. Although she reported continuing to cook, run errands, watch television, and do housework, she stated that she can sit or stand for only fifteen minutes at a time and that she must sit after walking around the grocery store once and while doing dishes. AR 48-49, 52-53, 447. In September 2012, she told PA Welshons during a consultative examination that she shopped for groceries (but had moderate pain when she finished) and that she did housework in ten to fifteen minute increments. AR 1142-43.

Kinzebach's reports of her activities of daily living (particularly that she can sit long enough to watch a movie or a softball game and that she can stand for more than an hour while cleaning and cooking) are inconsistent with Dr. Peterson's opined limitations that she can sit and stand for only thirty minutes at a time. Kinzebach faults the ALJ for relying on evidence from September 2007, when she had leg and bowel problems but had not yet alleged back pain, but her March 2009 report (filled out after she began experiencing back pain) also suggests that she can sit and stand for more than thirty minutes at a time. Moreover, even Kinzebach's statements in 2012 reflect that she is still able to perform a wide array of activities of daily living (although she alleges that she now takes breaks). "Although a claimant need not be bedridden . . . to work, . . . extensive daily activities" may be inconsistent with disability. *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007). An ALJ may consider whether a claimant's "daily activities belie the physical limitations contained in a [treating physician's] evaluation" when determining the weight to assign that evaluation. *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012). Substantial evidence supports that Kinzebach's activities of daily living are inconsistent with limitations as severe as found by Dr. Peterson. *See Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, . . . washing dishes, doing laundry, shopping, driving, and walking[] are inconsistent with subjective complaints of disabling pain.").

Treatment notes related to Kinzebach's ability to walk further support the ALJ's determination that the limitations opined by Dr. Peterson were inconsistent with the overall record. A September 2007 treatment note reflects that Kinzebach stated she had "no trouble walking" and that her leg pain was constant and without any relationship to walking. AR 461. Later the same month, she stated that her severe hip and leg pain "feels better if she walks around." AR 501. In November 2007, Kinzebach told Dr. Peterson that she was "[s]till trying to do some walking." AR 569. In March 2008, Dr. Peterson observed she "move[d] stiffly from [a] seated to [a] standing position." AR 563. In April 2008, she reported constant leg pain that was "at times . . . worse on

9

walking." AR 612. About two weeks later, she said her leg pain was not aggravated by exercise, standing, or walking. AR 559. Also in April 2008, Dr. Peterson noted she could stand on her toes and heels and that she could squat, although squatting caused her pain. AR 561. In May 2008, Kinzebach told Dr. Peterson that she was able to walk and function and that she "tr[ies] to walk and garden[,] but her legs hurt too much to enjoy it." AR 556. In October 2008, she reported leg pain, "especially after walking." AR 609. In May 2009, Kinzebach told Dr. Peterson that she "ha[d] been trying to walk some" and "to do a little bit of biking." AR 655. In June 2009, Kinzebach reported that she had a difficult time walking around due to increasing pain and that the pain in her hips was not "particularly bothersome" with exertion, although she generally reported more pain with greater activity. AR 653. In April 2010, treatment notes reflect that she was able to toe-and-heel walk and rise from a squat without difficulty, but she also reported that her legs fatigued easily and felt heavy. AR 936-37. In April 2011, she reported that she "has been on her feet more" and suggested that as a result, her "pain ha[d] moved up to the middle of her back." AR 910. A few days later, she drove herself to the emergency room seeking opioid medications to relieve her pain (which were given to her after back spasms were observed), and she reported worse pain lately due to increased activity and standing. AR 879-81. In November 2011, when seeking an increase in her oxycodone prescription, she explained that her pain had worsened and that she was no longer taking prescription medications "to function," but only for pain relief. AR 900-01. In December 2011, she reported that the pain in her legs was aggravated by sitting, standing, and walking and relieved by pain medications. AR 836. In April 2012, Kinzebach's neurosurgeon observed she was able to walk on her heel on her right foot but suffered weakness in her left foot (at that same appointment, he decided to perform back surgery on Kinzebach). AR 1039-40. The next day, Dr. Peterson noted she could stand on her toes and heels, and Kinzebach said her activity "is still somewhat limited." AR 983-84. After surgery, in June 2012, she was encouraged to walk and given home exercises of walking to work on endurance. AR 1126. At an appointment

with Dr. Peterson roughly four weeks after her surgery, Kinzebach reported that she had been doing some walking. AR 979. A few days later, she reported back pain that was aggravated by bending, lying down, sitting, and standing and that she had tried home exercises, walking, and ice, which provided only mild relief. AR 976. The ALJ also noted that most treatment notes reflect Kinzebach had a normal gait and station. *See* AR 502 (September 2007), 554 (July 2008), 556 (May 2008), 561 (April 2008), 563 (March 2008), 655 (May 2009), 711 (August 2010), 838 (December 2011), 964 (February 2012), 984 (April 2012); *see also* AR 550 (treatment note from February 2009 reflects Kinzebach "walks without a significant limp"), 551 (treatment note from January 2009 reflects she "ambulates independently"); *but see* AR 936 (treatment note from April 2010 reflects that "[s]tation and gait appear normal except where limited by pain"), 977 (treatment note from June 2012, when Kinzebach was recovering from surgery, reflects that she walked with a slight limp), 1043 (treatment note from May 2012, prior to surgery, reflects that Kinzebach ambulated with "minimal limp"), 1143 (PA Welshons observed in September 2012 "gait slow but without assistive device").

The treatment notes related to Kinzebach's ability to function (and particularly, to walk) further support the ALJ's determination that Dr. Peterson's RFC opinion was inconsistent with the overall record. Kinzebach argues that the ALJ improperly focuses on treatment notes from September 2007 and ignores "eight years of evidence of walking problems." Doc. 14 at 5. But treatment notes beyond September 2007 reflect Kinzebach's ability to walk—for example, in May 2009, after she began complaining of back pain, she reported going on walks and biking. Other treatment notes reflect that Kinzebach was routinely encouraged to walk. Although Kinzebach occasionally reported activity aggravating her pain, especially in later years, the ALJ reasoned that her "descriptions of symptoms to a medical source" may not have been accurate, as she "ha[d] significant motivation to provide a description . . . to increase the likelihood of obtaining the []medications" she sought. AR 1230. The treatment notes (especially when considered in light of Kinzebach's reports of her activities of daily living) lend further

11

support that Kinzebach was able to be on her feet and function for more than thirty minutes at a time. Substantial evidence supports the ALJ's determination that the treatment notes are inconsistent with Dr. Peterson's RFC opinion.

Kinzebach points to evidence that she had numerous injections in her back to try to alleviate her pain; that most treatment notes reflect complaints of constipation or diarrhea and, after 2009, back pain; that she has consistently taken prescription pain relievers; that she has had electromyography (EMG) tests of her legs and magnetic resonance imaging (MRI) scans of her spine; and that she had back surgery in May 2012. But merely because Kinzebach suffered pain does not mean that she was disabled—at issue is whether Kinzebach's pain was so great that it limited her ability to function such that she could not work. As statements in her function report make explicit, she was able to perform many activities of daily living despite suffering pain. The ALJ could find that she was also able to work despite suffering pain.

The substantial-evidence standard is a deferential one, and reversal is not warranted merely because I would weigh the evidence differently than the ALJ. Although the record demonstrates that Kinzebach suffers from pain, it also supports the ALJ's determination that Kinzebach is not as functionally limited as found by Dr. Peterson. Because the ALJ gave a "good reason" supported by substantial evidence for the weight given to Dr. Peterson's opinion, he did not err.

### B. Other RFC Opinions

Kinzebach argues that the ALJ erred by assigning little weight to the RFC opinion of PA Schreiber. AR 1226. She also argues the ALJ erred by assigning greater weight to the RFC opinions of the non-examining state agency consultants than to Dr. Peterson's opinion. AR 1229.

For claims filed before March 27, 2017, a physician assistant is not an "acceptable medical source" whose opinion may be entitled to controlling weight under the regulations. 20 C.F.R. §§ 404.1502(a), 404.1527(a)(1), (c)(2). Nevertheless, the ALJ

must consider opinions from physician assistants using the same factors as when considering treating-source opinions that are not entitled to controlling weight. 20 C.F.R. § 404.1527(f).

> The entirety of PA Schreiber's January 2012 opinion letter is below:
>
> [Kinzebach] is currently under my medical care. [Kinzebach] has been seen and treated by multiple providers for her chronic low back pain. Her most recent MRI of her spine demonstrated central disk protrusion at L4-5 with nerve root encroachment. This MRI was dated [November 10, 2011]. [Kinzebach] is currently being evaluated and treated in [Iowa City] by a neurologist as well as a local neurosurgeon. While conservative care has been the plan, there is a possibility of lumbar disk surgery. [Kinzebach] currently uses a regiman of Oxycodone, Tramadol, and Soma to manage her pain, but still feels it is uncontrolled. She does not feel capable of working due to her chronic pain and use of prescription pain medications. She is requesting an appeal in regards to her denial of social security.

AR 842. The ALJ found that PA Schreiber "merely recited the claimant's allegations" and that "there is no opinion to evaluate." AR 1226.

Kinzebach argues that PA Schreiber "indicated that [Kinzebach] would not be capable of working due to chronic pain and use of prescription pain medications" and that the ALJ erred in not giving a good reason for discounting this opinion. Doc. 14 at 11. First, even if PA Schreiber had opined that Kinzebach was disabled due to her pain, an ALJ is not required to give any weight to a source's overall conclusion that a claimant is disabled. *See Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007); 20 C.F.R. § 404.1527(d)(1). Second, the ALJ is correct that PA Schreiber did not even offer such an opinion; instead, PA Schreiber stated that Kinzebach "feel[s]" her pain is uncontrolled and that Kinzebach "does not feel" she can work, without stating that PA Schreiber agreed with this assessment.

Kinzebach also challenges the weight the ALJ gave to the opinions of the state agency consultants. Dr. Panek opined in November 2007, and Dr. Daly in April 2009, that Kinzebach could lift ten pounds frequently and twenty pounds occasionally; that she could sit, stand, or walk for six hours in an eight-hour day, with normal breaks; and that

13

she could occasionally climb ladders, ropes, and scaffolds. AR 521, 523, 623-24. Dr. Daly further opined that she should avoid moderate exposure to hazards such as heights and machinery (Dr. Panek did not find her so limited). AR 524, 626. The ALJ gave significant weight to these opinions, finding that unlike Dr. Peterson's opinion, the limitations were consistent with Kinzebach's activities of daily living and other evidence in the record as a whole. AR 1229. The ALJ recognized that the state agency consultants did not have all the medical records and other evidence when they evaluated Kinzebach's RFC, however. *Id.*

Kinzebach suggests that the ALJ could not give greater weight to the opinions of the state agency consultants than to the opinion of Dr. Peterson. Because the ALJ gave a good reason for giving little weight to Dr. Peterson's opinion (discussed above), the ALJ could properly assign greater weight to RFC opinions from non-treating, non-examining sources. *See Ponder v. Colvin*, 770 F.3d 1190, 1194-95 (8th Cir. 2014) (concluding that the treating physician's RFC opinion "cannot trump" three non-examining consultants' opinions "solely because he was [claimant's] primary care physician" when his opinion was inconsistent with claimant's daily activities and the treatment records); *see also Vance v. Berryhill*, 860 F.3d 1114, 1120-21 (8th Cir. 2017) (holding that when the ALJ gives a good reason for discounting a treating physician's opinion, the ALJ may "rely instead on the opinions of the state agency medical consultants," as long as those opinions are "more consistent with the medical evidence"). The ALJ spent nine pages outlining treatment records and other evidence that was inconsistent with Dr. Peterson's opinion and consistent with the state agency consultants' opinions. AR 1223-32. Substantial evidence, including some medical evidence, thus supports the ALJ's RFC determination. *See Stormo*, 377 F.3d at 806-807 (finding some medical evidence supported the ALJ's physical RFC determination when it was consistent with the state agency medical consultants' opinions, and at least one treating physician's physical RFC opinion was in the record but assigned non-controlling weight); *cf. Singh*

14

*v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (ALJ could not rely on opinions of state agency consultants when their opinions conflicted with the treating physician's opinion *and* the overall record).

### C. Kinzebach's Subjective Complaints

Kinzebach argues that the ALJ improperly discounted some of her subjective complaints. When evaluating a claimant's subjective complaints—including pain, shortness of breath, weakness, or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Polaski*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).[10] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Black*, 143 F.3d at 386. The ALJ may not discount a claimant's subjective allegations based "solely on a lack of objective medical evidence." *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir. 1991). The ALJ may reject a claimant's subjective complaints, however, based on "objective medical evidence to the contrary," *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). "The ALJ [i]s not required to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those

---

[10] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. *Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

15

considerations before discounting [the claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).

Here, contrary to Kinzebach's argument otherwise (which focuses solely on the ALJ's conclusion paragraph), the ALJ set forth several reasons for discrediting Kinzebach's subjective complaints during the course of his eleven-page discussion of Kinzebach's RFC. AR 1221-32. At the hearing in November 2015, Kinzebach testified that she quit working in August 2007 because of her bowel problems, which had caused her to have several accidents at work. AR 1261-62. The ALJ found this inconsistent with evidence that Kinzebach quit working to care for her sick mother: she told PA Schreiber that she had problems with her bowels at work, which was stressful for her, but that she quit working to care for her mother; and she testified in August 2010 that she "basically quit [her] job because of . . . incontinence problems," but she admitted that she cared for her mother once she quit and that her "mother being ill gave [her] the push . . . she needed" to quit her job. AR 61, 68, 898. Substantial evidence supports the ALJ's determination that Kinzebach was able to work despite her bowel problems and that she quit to care for her mother, not because of her disability, which is an appropriate factor for the ALJ to consider when determining whether to fully credit Kinzebach's subjective complaints. *See Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001).

The ALJ also found that although Kinzebach alleged greater problems with her bowels, the only limitation she suffered related to that ailment was the need to be near a bathroom. Kinzebach testified that since having colon cancer in 2004, she suffered incontinence that caused her to have several accidents at work where she had to go home to change clothes, which was embarrassing. AR 61-62. She also occasionally suffered from constipation and would take laxatives (sometimes leading to incontinence problems), and at least once during the relevant time period, she reported constipation and vomiting. AR 1163. The ALJ noted that Kinzebach was able to work for three years despite her incontinence problems. AR 61-62. The ALJ also found that the treatment records

demonstrated that although Kinzebach continued to complain of constipation throughout the relevant time period, her incontinence problems improved in later years (when her primary complaints related to back pain). AR 1228. For example, she denied problems with bowel control in March 2008, April 2008, May 2008, May 2009, and October 2010, and she reported in April 2012 that although she had ongoing problems with constipation, "[e]pisodes of fecal incontinence have gotten markedly less." AR 556, 561, 563, 655, 924, 983; *but see* AR 652 (Kinzebach included incontinence as an ailment in June 2009 at her first appointment with a new provider). Substantial evidence supports the ALJ's decision to not fully credit Kinzebach's complaints of bowel incontinence throughout the relevant time period.

The ALJ also noted that the record is replete with evidence that Kinzebach abused prescription pain medications and had a history of excessive use, which the ALJ reasoned "does not allow for the presumption that [a claimant] generally gives accurate descriptions of symptoms to a medical source," as the claimant "has significant motivation to provide a description of [her] symptoms . . . to increase the likelihood of obtaining the []medications [she] seeks." AR 1230. For example, on January 6, 2009, Dr. Peterson noted that Kinzebach had taken 240 Endocet (the generic name for Percocet, a combination of oxycodone and acetaminophen) since December 19, 2008, which Dr. Peterson found an "excessive use of Endocet," and he began to taper Kinzebach's prescription. AR 551. In a letter to the Social Security Administration, Kinzebach admitted that she "g[ot] carried away with the opioids" that December. AR 424.[11] In February 2009, Dr. Peterson noted that Kinzebach was having difficulty tapering her use of Endocet. AR 550. In June 2009, Kinzebach looked into switching to a different doctor because she was frustrated that Dr. Peterson was tapering her pain medications (and the

---

[11] In that same letter, Kinzebach also said that Dr. Sarsfield is "full of himself" and "not qualified"—Dr. Sarsfield had opined in April 2008 that she should be weaned off OxyContin and thought it could be contributing to her constipation and leg problems. AR 424, 559-60.

17

other doctor noted Kinzebach "has had some issues with early refills and overuse of pain medications). AR 654. In November 2011, she admitted to PA Schreiber that she started abusing prescription pain medications in 2007. AR 898, 900. In February 2012, PA Schreiber counseled Kinzebach on "tak[ing] responsibility for her history of narcotic abuse" when Kinzebach was upset that PA Schreiber switched her prescription from (short-acting) oxycodone to (long-acting) OxyContin because of concerns she was using oxycodone to get high. AR 894-97.[12] A few days later, she was rushed to the emergency room after her husband found her lying on the floor, unresponsive. AR 969. Kinzebach was lethargic, her speech was slurred, and treatment records reflect a "possible overdose"[13] and that Kinzebach initially denied "t[aking] too much of a medication, but [her] responses change[d] with questioning." AR 968-69. In May 2012, treatment notes reflect that Kinzebach's husband administered her oxycodone prescription to reduce her risk of abuse. AR 1042. Dr. Peterson noted in June 2012 that Kinzebach had a history of "excessive use" of short-acting narcotics. AR 976. Substantial evidence supports that Kinzebach overused prescription pain medications, and "[a] claimant's misuse of medications is a valid factor in an ALJ's credibility determinations." *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003).

When evaluating Kinzebach's subjective complaints, the ALJ also considered inconsistencies in the overall record, which are discussed further above in the section on Dr. Peterson's RFC opinion. The ALJ gave numerous valid reasons, supported by substantial evidence, for the weight given to Kinzebach's subjective complaints.

---

[12] In a July 2012 letter to the Social Security Administration, Kinzebach complains that a doctor who "saw her for [five] minutes tops[] called [PA Schreiber] and told her [Kinzebach] was only taking oxycodone to get high," which resulted in PA Schreiber's decision to switch Kinzebach from oxycodone to OxyContin. AR 447.

[13] Kinzebach has made a handwritten comment in the treatment notes denying that she suffered an overdose. AR 968.

18

### *III. CONCLUSION*

I recommend that the district court **affirm** the decision of the Social Security Administration and enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 19th day of January, 2018.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa